Leah T. Handelman
Natalie A. Jeude
GARLINGTON, LOHN & ROBINSON, PLLP
350 Ryman Street • P. O. Box 7909
Missoula, MT 59807-7909
Phone (406) 523-2500
Fax (406) 523-2595
lthandelman@garlington.com
najeude@garlington.com

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

NATIONAL CASUALTY COMPANY,

Plaintiff,

v.

THE DOCKS BAYSIDE, LLC, DBA HARBOR GRILLE AT LAKESIDE,

Defendant,

v.

ALLEN K. BALL, individually and as PERSONAL REPRESENTATIVE OF THE ESTATE OF LEAYNE LYNN BALL AND NEVADA JACKSON

Intervenors.

Cause No.: CV 25-81-M-JTJ

AMENDED COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff National Casualty Company ("National Casualty") by and through counsel of record, Garlington, Lohn, & Robinson, PLLP, for its Amended Complaint for Declaratory Judgement, states and alleges as follows:

## I. PARTIES, JURISDICTION, AND VENUE

1. Plaintiff National Casualty is an insurance company organized under the laws of Ohio and with its principal place of business in Scottsdale, Arizona. National Casualty is authorized to conduct business in Montana.

2. Defendant The Docks Bayside LLC d/b/a Harbor Grille at Lakeside (hereinafter "Harbor Grille") is a domestic limited liability company formed in the State of Montana with a principal place of business in Lakeside, Montana.

3. Harbor Grille's members are Nicholas J. Coussoulis and Christina Coussoulis, Trustees of the Coussoulis Family Trust dated September 9, 2003. Nicholas J. Coussoulis and Christina Coussoulis are citizens of California.

4. National Casualty issued a Commercial Marine Liability Policy to Flathead Harbor, LLC DBA: Flathead Harbor at Lakeside bearing policy number OMO0027506 and with a policy period from 4/2/2024 to 4/2/2025 ("Policy"). Harbor Grille is also a named insured under the Policy. A true and correct copy of the Policy is attached as Exhibit A ("Ex. A").

5. Harbor Grille seeks coverage under the Policy for claims asserted against it in an action styled: *Ball v. The Docks Bayside, LLC d/b/a Harbor Grille,*

*et al.*, United States District Court for the District of Montana, Missoula Division, Cause No. CV-24-142-M-KLD ("Ball Underlying Action").

6. Harbor Grille also seeks coverage under the Policy for claims asserted against it in an action styled: *Jackson v. The Docks Bayside, LLC d/b/a Harbor Grille, et al.*, United States District Court for the District of Montana, Missoula Division, Cause No. CV-9:24 CV-00150-KLD ("Jackson Underlying Action").

7. Harbor Grille also seeks coverage under the Policy for claims asserted against it in action styled: *Bower v. The Docks Bayside, LLC d/b/a Harbor Grille, et al.*, United States District Court for the District of Montana, Missoula Division, Cause No. CV-25-134-M-KLD.

8. Jurisdiction is proper in this Court under 28 U.S.C. § 1332 because the matter in controversy exceeds $75,000.00 and National Casualty and Harbor Grille are citizens of different states.

9. Venue is proper in the Missoula Division of the District of Montana as Harbor Grille's principal place of business is in Flathead County, the events giving rise to the Underlying Actions occurred in Flathead County, and any judgment against Harbor Grille will be obtained in the Missoula Division pursuant to the Underlying Actions further described below.

10. There is an actual justiciable controversy between National Casualty and Harbor Grille concerning their rights and obligations under the Policy.

## II. GENERAL ALLEGATIONS

11. The parties' rights and obligations under the Policy, specifically whether National Casualty has a duty to defend or indemnify Harbor Grille on the claims alleged against it in the Underlying Actions, is the subject of this action.

### A. Ball Underlying Action

12. Allen K. Ball, individually and as Personal Representative of the Estate of Leayne Lynn Ball filed an Amended Complaint and Demand for Jury Trial against Harbor Grille, Lower Valley Processing, Inc. ("Lower Valley"), Range Land & Cattle Co., LLC ("Range Land"), and John Does 1-4 on July 15, 2025. A true and correct copy of the Ball Amended Complaint is attached as Exhibit B. ("Ex. B").

13. The allegations of the Ball Amended Complaint can be summarized as follows:

Harbor Grille owns the restaurant located at 7135 US Highway 93 in Lakeside, Montana. According to the Ball Amended Complaint, Leayne was a patron at Harbor Grille on July 7, 2024, during which time she consumed a wagyu beef burger prepared using beef from the single lot of *E. coli* O157:H7 contaminated beef, which caused her illness and injuries. Leayne allegedly became symptomatic on or about July 9, 2024 with stomach cramps, muscle aches, and headache and sought medical treatment in Montana. Leayne was eventually

transferred to University of Utah for further treatment but died on July 18, 2024. The Ball Amended Complaint alleges that Leayne's cause of death according to her death certificate is septic shock due to (or as a consequence of) Hemolytic Uremic Syndrome due to (or as a consequence of) Escherichia coli O157:H7 Colitis and Bacteremia.

The Ball Amended Complaint alleges that on July 25, 2024, Flathead City-County Health Department ("FCCHD") and the Montana Department of Public Health and Human Services ("DPHHS") received confirmatory testing results of clinical and food samples verifying ground beef as the exposure of concern. Specifically, the source of the outbreak was wagyu beef from one lot number and all of the reported cases alleged reported eating undercooked or made-to-order burgers at one of multiple restaurants in Flathead County, including Harbor Grille. According to the Ball Amended Complaint, DPHHS confirmed that Lower Valley and Range Land were the source of the outbreak.

The Ball Amended Complaint further alleges that the wagyu beef used by Harbor Grille to prepare Leayne's burger was supplied by Range Land, which was responsible for raising the cattle and distributing the resulting frozen patties to local food establishments, including Harbor Grille. Range Land allegedly collected the frozen patties from Lower Valley on June 24, 2024, and subsequently made "at least a dozen separate deliveries to no fewer than six different restaurants

throughout the Flathead area over a span of several days." It is further alleged that Harbor Grille received at least three distinct deliveries of frozen patties from Range Land on June 26, 2024 (120 patties); July 8, 2024 (53 patties); and July 10, 2024 (101 patties). According to the Ball Amended Complaint, Harbor Grille served wagyu beef burgers made from patties "delivered on different dates, likely prepared by different kitchen staff under varying sanitation, preparation, and handling conditions." "Multiple patrons" allegedly became ill on different days after consuming burgers prepared on different times, on different days.

14. The Ball Complaint alleges four specific causes of action.

15. Count 1 of the Ball Amended Complaint is for Strict Liability and alleges that Defendants were manufacturers or sellers of adulterated food products and that such food products were defective at the time it left Defendants' control and defective and unreasonably dangerous for its ordinary and expected use because it contained *E. coli* O157:H7. It is further alleged that the products were delivered to Leayne without any change in defective condition and was sold and used in a manner expected and intended and was consumed by Leayne. As a result, Defendants allegedly breached their duty of care to produce and sell food that was not adulterated and was fit for human consumption, free of pathogenic bacteria, and safe to the extent contemplated by a reasonable consumer, thereby causing Leayne injury and damages.

16. Count 2 of the Ball Amended Complaint is for Breach of Warranty and alleges that Defendants produced, distributed, and sold contaminated food to Leayne without substantial change in condition that injured her and caused her *E. coli* O157:H7 infection. As a result, Defendants are allegedly liable for breaches of express and implied warranties made to Leayne with respect to the food product sold to her including implied warranties of merchantability and fitness for a particular use. It is further alleged that Defendants breached expressed warranties made through their sale of food to the public and by the statements and conduct of their employees and agents that the food product ultimately sold to Leayne "was fit for human consumption and not otherwise adulterated or injurious to health." Ex. B at 16. As direct and proximate result, Leayne allegedly suffered *E. coli* O157:H7 infection and adverse effects associated therewith. Leayne was also allegedly forced to endure great pain, suffering and inconvenience and may endure the same and more in the future.

17. Count 3 of the Ball Amended Complaint is for Negligence and alleges that Defendants had a duty to comply with all statutory and regulatory provisions that applied to the sale of food products that injured Plaintiff, including the Federal Meat Inspection Act and Montana food and public health statutes. Defendants allegedly violated these laws through the sale of adulterated food. This Count further alleges that Defendants breached their duties to warn Leayne of dangers

associated with selling food and cross-contamination; to use supplies and raw materials that followed laws and were fit for human consumption; to properly supervise, train and monitor employees engaged in the preparation of food products and comply with health regulations; and to take reasonable measures to ensure food products were safely manufactured.

18. Count 4 of the Ball Amended Complaint is for Negligence Per Se and alleges that Defendants had a duty to comply with all applicable state and federal regulations for food safety; that Leayne was in the class of persons intended to be protected by these regulations; and that Leayne was injured as a result of Defendants' violation of the same.

19. The Ball Amended Complaint also alleges that Allan and Leayne's estate are entitled to receive lawful damages under Montana's survival and wrongful death statutes.

20. Harbor Grille tendered the Ball Underlying Action to National Casualty.

21. National Casualty issued a Reservation of Rights letter to Harbor Grille on December 13, 2024, under which it agreed to provide Harbor Grille with a defense of the allegations in the Ball Underlying Action under a complete reservation of rights. A true and correct copy of the December 13, 2024 Reservation of Rights letter is attached as Exhibit C ("Ex. C").

## B. Jackson Underlying Action

22. Nevada Jackson filed an Amended Complaint and Demand for Jury Trial against Harbor Grille, Lower Valley, Range Land, and John Does 1-4 on July 15, 2025. A true and correct copy of the Jackson Amended Complaint is attached as Exhibit D ("Ex. D").

23. The allegations of the Jackson Amended Complaint can be summarized as follows:

Jackson dined at the Harbor Grille on or about July 10, 2024, during which time he consumed a wagyu beef burger prepared using beef from the single lot of *E. coli* O157:H7 contaminated beef, which caused him illness and injuries. Jackson allegedly became symptomatic on or about July 13, 2024, with diarrhea, nausea, and severe stomach cramps. His symptoms allegedly became so severe that he required emergency medical treatment and was hospitalized from July 13 through July 17, 2024 and allegedly required additional medical care and treatment thereafter.

The Jackson Amended Complaint alleges that on July 25, 2024, FCCHD and DPHHS received confirmatory testing results of clinical and food samples verifying ground beef as the exposure of concern. Specifically, the source of the outbreak was wagyu beef from one lot number and all of the reported cases alleged reported eating undercooked or made-to-order burgers at one of multiple

restaurants in Flathead County, including Harbor Grille. According to the Jackson Amended Complaint, DPHHS confirmed that Lower Valley and Range Land were the source of the outbreak.

The Jackson Amended Complaint further alleges that the wagyu beef used by Harbor Grille to prepare Jackson's burger was supplied by Range Land, which was responsible for raising the cattle and distributing the resulting frozen patties to local food establishments, including Harbor Grille. Range Land allegedly collected the frozen patties from Lower Valley on June 24, 2024, and subsequently made "at least a dozen separate deliveries to no fewer than six different restaurants throughout the Flathead area over a span of several days." It is further alleged that Harbor Grille received at least three distinct deliveries of frozen patties from Range Land on June 26, 2024 (120 patties); July 8, 2024 (53 patties); and July 10, 2024 (101 patties). According to the Jackson Amended Complaint, Harbor Grille served wagyu beef burgers made from patties "delivered on different dates, likely prepared by different kitchen staff under varying sanitation, preparation, and handling conditions." "Multiple patrons" allegedly became ill on different days after consuming burgers prepared on different times, on different days.

24. The Jackson Amended Complaint alleges four specific causes of action.

25. Count 1 of the Jackson Amended Complaint is for Strict Liability and alleges that Defendants were manufacturers or sellers of adulterated food products. As to Harbor Grille, the adulterated food product was the contaminated wagyu beef burger Jackson allegedly purchased and consumed. This Count further alleges that the food product that was sold was defective at the time it left Defendants' control and defective and unreasonably dangerous for its ordinary and expected use because it contained *E. coli* O157:H7. It is further alleged that the product was delivered to Jackson without any change in defective condition and was sold and used in a manner expected and intended and was consumed by Jackson. As a result, Defendants allegedly breached their duty of care to produce and sell food that was not adulterated and was fit for human consumption, free of pathogenic bacteria, and safe to the extent contemplated by a reasonable consumer, thereby causing Jackson injury and damages.

26. Count 2 of the Jackson Amended Complaint is for Breach of Warranty and alleges that Defendants produced, distributed, and sold contaminated food to Jackson without substantial change in condition that injured him and caused his *E. coli* O157:H7 infection. As a result, Defendants are allegedly liable for breaches of express and implied warranties made to Jackson with respect to the food product sold to him including implied warranties of merchantability and fitness for a particular use. It is further alleged that Defendants breached expressed

warranties made through their sale of food to the public and by the statements and conduct of their employees and agents that the food product ultimately sold to Jackson was fit for human consumption and not otherwise adulterated or injurious to health. As direct and proximate result, Jackson allegedly suffered *E. coli* O157:H7 infection and adverse effects associated therewith. Jackson was also allegedly forced to endure great pain, suffering and inconvenience and may endure the same and more in the future.

27. Count 3 of the Jackson Complaint is for Negligence and alleges that Defendants had a duty to comply with all statutory and regulatory provisions that applied to the sale of food products that injured Jackson, including the Federal Meat Inspection Act and Montana food and public health statutes. Defendants allegedly violated these laws through the sale of adulterated food. This Count further alleges that Defendants breached their duties to warn Jackson of dangers associated with selling food and cross-contamination; to use supplies and raw materials that followed laws and were fit for human consumption; to properly supervise, train and monitor employees engaged in the preparation of food products and comply with health regulations; and to take reasonable measures to ensure food products were safely manufactured.

28. Count 4 of the Jackson Complaint is for Negligence Per Se and alleges that Defendants had a duty to comply with all applicable state and federal regulations for food safety; that Jackson was in the class of persons intended to be protected by these regulations; and that Jackson was injured as a result of Defendants' violation of the same.

29. Harbor Grille tendered the Jackson Underlying Action to National Casualty.

30. National Casualty issued a Reservation of Rights letter to Harbor Grille on April 15, 2025, under which it agreed to provide Harbor Grille with a defense of the allegations in the Jackson Underlying Action under a complete reservation of rights. A true and correct copy of the April 15, 2025 Reservation of Rights letter is attached as Exhibit E ("Ex. E").

**C. Bower Underlying Complaint**

31. Valerie Michael as mother of Lillian Bower filed an Amended[1] Complaint and Demand for Jury Trial against Harbor Grille and "John Does 1-4" on August 15, 2025. A true and correct copy of the Bower Complaint is attached as Exhibit F ("Ex. F").

[1] The Complaint is titled an Amended Complaint; however, it is first and only Complaint filed in this action, and thus we assume it is mistitled.

32. The allegations of the Bower Complaint can be summarized as follows:

Bower, who was 16 years old at the time, purchased and consumed a wagyu beef burger at Harbor Grille on or about July 10, 2024, which Harbor Grille had prepared utilizing ground beef from the single production lot that was contaminated by *E. coli* O157:H7. According to the Bower Complaint, Bower is from Florida but had been visiting her dad in Montana when she consumed the contaminated burger. Bower allegedly developed the onset of unpleasant gastrointestinal symptoms on July 10, 2024, including nausea, bloody diarrhea and stomach cramping. On July 13, 2024, Bower alleged presented to St. John's Health Medical Center in Jackson Hole, Wyoming for treatment.

Bower also treatment at a different facility—Eastern Idaho Regional Center Emergency Department—in the evening of July 13, 2024, due to worsening pain and GI symptoms. According to the Bower Complaint, stool samples were obtained which were allegedly positive for Shiga toxin associated with *E.coli* O157. Bower was discharged with instructions to follow-up with her providers in Florida.

On July 14, 2024, Bower arrived at Intermountain Primary Children's Hospital in Salt Lake City, Utah, where she described worsening lethargy and increasingly bloody diarrhea. She was eventually diagnosed with *E. coli* serotype

157:H7 infection, admitted, treated and monitored for the course of the next four days. Upon discharge on July 18, 2024, her physical condition had greatly improved, and she was advised to follow-up with her pediatrician within the next week.

The Bower Complaint alleges that on July 25, 2024, FCCHD and DPHHS received confirmatory testing results of clinical and food samples verifying ground beef as the exposure of concern. Specifically, the source of the outbreak was wagyu beef from one lot number and all of the reported cases alleged reported eating undercooked or made-to-order burgers at one of multiple restaurants in Flathead County, including Harbor Grille. According to the Bower Complaint, DPHHS confirmed that Lower Valley and Range Land were the source of the outbreak.

The Bower Complaint further alleges that the wagyu beef used by Harbor Grille to prepare Jackson's burger was supplied by Range Land, which was responsible for raising the cattle and distributing the resulting frozen patties to local food establishments, including Harbor Grille. Range Land allegedly collected the frozen patties from Lower Valley on June 24, 2024, and subsequently made "at least a dozen separate deliveries to no fewer than six different restaurants throughout the Flathead area over a span of several days." It is further alleged that Harbor Grille received at least three distinct deliveries of frozen patties from

Range Land on June 26, 2024 (120 patties); July 8, 2024 (53 patties); and July 10, 2024 (101 patties). According to the Bower Complaint, Harbor Grille served wagyu beef burgers made from patties "delivered on different dates, likely prepared by different kitchen staff under varying sanitation, preparation, and handling conditions." "Multiple patrons" allegedly became ill on different days after consuming burgers prepared on different times, on different days.

33. The Bower Complaint alleges four specific causes of action.

34. Count 1 is for Strict Liability and alleges that Defendants were manufacturers or sellers of adulterated food products. As to Harbor Grille, the adulterated food product was the contaminated wagyu beef burger Bower allegedly purchased and consumed. This Count further alleges that the food product that was sold was defective at the time it left Defendants' control and defective and unreasonably dangerous for its ordinary and expected use because it contained *E. coli* O157:H7. It is further alleged that the product was delivered to Plaintiff without any change in defective condition and was sold and used in a manner expected and intended and was consumed by Bower. As a result, Defendants allegedly breached their duty of care to produce and sell food that was not adulterated and fit for human consumption, free of pathogenic bacteria, and safe to the extent contemplated by a reasonable consumer, thereby causing Bower injury and damages.

35. Count 2 is for Breach of Warranty and alleges that Defendants produced, distributed, and sold contaminated food to Bower without substantial change in condition that injured her and caused her *E. coli* O157:H7 infection. As a result, Defendants are allegedly liable for breaches of express and implied warranties made to Bower with respect to the food product sold to her including implied warranties of merchantability and fitness for a particular use. It is further alleged that Defendants breached expressed warranties made through their sale of food to the public and by the statements and conduct of their employees and agents that the food product ultimately sold to Bower was fit for human consumption and not otherwise adulterated or injurious to health. As direct and proximate result, Bower allegedly suffered *E. coli* O157:H7 infection and adverse effects associated therewith. Bower was also allegedly forced to endure great pain and suffering and inconvenience and may endure the same and more in the future.

36. Count 3 is for Negligence and alleges that Defendants had a duty to comply with all statutory and regulatory provisions that applied to the sale of food products that injured Bower, including the Federal Meat Inspection Act and Montana food and public health statutes. Defendants allegedly violated these laws through the sale of adulterated food. This Count further alleges that Defendants breached their duties to warn Bower of dangers associated with selling food and cross-contamination; to use supplies and raw materials that followed laws and were

fit for human consumption; to properly supervise train and monitor employees engaged in the preparation of food products and comply with health regulations; and to take reasonable measures to ensure food product were safely manufactured.

37. Count 4 is for Negligence Per Se and alleges that Defendants had a duty to comply with all applicable state and federal regulations for food safety; that Bower was in the class of persons intended to be protected by these regulations; and that Bower was injured as a result of Defendants' violation of the same.

38. Harbor Grille tendered the Bower Underlying Action to National Casualty.

39. National Casualty issued a Second Supplemental Reservation of Rights letter to Harbor Grille on September 5, 2025, to address the allegations in the Ball Amended Complaint, Jackson Amended Complaint, and Bower Complaint. A true and correct copy of the September 5, 2025 Second Supplemental Reservation of Rights letter is attached as Exhibit G ("Ex. G").

**D. Correspondence with Underlying Plaintiffs' Counsel**

40. On March 21, 2025, counsel for Ball and Jackson sent a letter to Harbor Grille with its "assessment of the existing insurance coverage" for Harbor Grille and specifically outlining its position that the multiple claims against Harbor Grille constitute multiple occurrences under the Policy. A true and correct copy of

the March 21, 2025 letter from Underlying Plaintiffs' Counsel is attached as Exhibit H ("Ex. H").

41. National Casualty responded to the March 21, 2025 letter on April 15, 2025, explaining that National Casualty's coverage position is provided in the reservation of rights letters sent to Harbor Grille and explaining that it disagreed with Underlying Plaintiffs' counsel's position that each claim constitutes a separate occurrence. A true and correct copy of the April 15, 2025 letter from National Casualty to Underlying Plaintiffs' Counsel is attached as Exhibit I ("Ex. I").

42. National Casualty also issued a Supplemental Reservation of Rights letter to Harbor Grille on July 14, 2025, in order to formalize its opinion on the number of occurrences alleged in the Underlying Actions. A true and correct of the July 14, 2025 Supplemental Reservation of Rights Letter is Attached as Exhibit J ("Ex. J").

**E. Relevant Policy Provisions**

43. The Policy's liability coverage is set forth under the Commercial Liability Coverage Form OM-P-17-TRI (09-20) and is defense within limits coverage.

44. The Commercial Marine Liability Coverage Form affords Bodily Injury and Property Damage Liability coverage under Coverage A as follows:

**SECTION I – COVERAGES**

**COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of **bodily injury** or **property damage** to which this insurance applies. We will have the right and duty to defend the insured against any **suit** seeking those damages. However, we will have no duty to defend the insured against any **suit** seeking damages for **bodily injury** or **property damage** to which this insurance does not apply. We may, at our discretion, investigate any **occurrence** and settle any claim or **suit** that may result. But:

**(1)** The amount we will pay for damages is limited as described in **SECTION III – LIMITS OF INSURANCE;** and

**(2)** Our right and duty to defend ends when we have used up the applicable Limit of Insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C.**

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under **SUPPLEMENTARY PAYMENTS – COVERAGES A AND B.**

Ex. A at 12.

45. Coverage A is subject to the following relevant exclusions:

**2. Exclusions**

This insurance does not apply to:

. . .

**c. Biological Agents**

**Bodily injury** or **property damage**, however caused, arising, directly or indirectly, out of:

**(1)** Actual, alleged or threatened contaminative, pathogenic, toxic or other hazardous properties of **biological agents**.

**(2)** Requests, demands, orders or regulatory or statutory requirements that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of any **biological agents**.

**(3)** Claims or proceedings by or on behalf of a governmental authority or others for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of any **biological agents**.

. . .

**y. Punitive or Exemplary Damages**

Any obligation to pay for any award, judgment, penalty, **defense costs**, interest, or other sums specifically attributable to the punitive or exemplary damage claim. We will, however, provide a defense if **suit** is brought seeking both compensatory and punitive or exemplary damages.

Ex. A at 13-20.

46. The Policy contains Endorsement OM-633-TRI (09-20)- Absolute Communicable Disease Exclusion which modifies the Commercial Marine Liability Coverage as follows:

**ABSOLUTE COMMUNICABLE DISEASE EXCLUSION**

. . .

We will not defend any claim or suit, nor pay damages, medical expenses or loss, directly or indirectly caused by, resulting from, arising out of, related to, or composed or comprised of the actual or suspected presence of a **communicable disease** and/or **biological agents** capable of causing a communicable disease. This exclusion applies regardless of any other cause or event that contributes concurrently or in any sequence to any such claim,

suit, damages, medical expenses, or loss and regardless of whether such other cause or event is considered to be proximate or remote.

This exclusion applies even if the claims against any **insured** allege negligence or other wrongdoing in the:

**a.** Supervising, hiring, employing, training or monitoring of others who may be infected with **biological agents** and/or a **communicable disease;**

**b.** Testing or failure to test for **biological agents** and/or a **communicable disease;**

**c.** Failure to prevent the spread of **biological agents** and/or a **communicable disease;** or

**d.** Failure to report **biological agents** and/or a **communicable disease** to authorities.

However, this exclusion does not apply to **bodily injury** to any crew member which occurs while the crew member is in service of the insured's **watercraft.**

For purposes of this exclusion, **communicable disease** means an illness caused by an infectious agent or its toxins that occurs through the direct or indirect transmission of the infectious agent or its products or toxins from an infected individual or via an animal, vector, or the inanimate environment to an animal or human host.

For purposes of this exclusion, **biological agents** means an infectious agent or its toxins, including, but not limited to bacteria, viruses, **fungi/fungus,** parasites, yeasts, molds and other microorganisms, whether man-made or naturally occurring.

Ex. A at 122.

47. The Commercial Marine Liability Coverage Form addresses Supplementary Payments under Coverage A as follows:

**SUPPLEMENTARY PAYMENTS – COVERAGES A AND B**

Supplementary Payments are included in the limits of this policy and are not in addition to those limits. Refer to **SECTION III – LIMITS OF INSURANCE.**

**1.** We will pay, with respect to any claim we investigate or settle, or any **suit** against an insured we defend:

**a.** All expenses we incur.

**b.** Up to two hundred fifty dollars ($250) for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

**c.** The cost of bonds to release attachments, but only for bond amounts within the applicable Limit of Insurance. We do not have to furnish these bonds.

**d.** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or **suit**, including actual loss of earnings up to two hundred fifty dollars ($250) a day because of time off from work.

**e.** All court costs taxed against the insured in the **suit**. However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

**f.** Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable Limit of Insurance, we will not pay any prejudgment interest based on that period of time after the offer.

**g.** All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable Limit of Insurance.

These payments will reduce the Limits of Insurance.

Ex. A at 28.

48. The Commercial Marine Liability Coverage Form contains Medical Payments Coverage under Coverage C – Medical Payments as follows:

**COVERAGE C – MEDICAL PAYMENTS**

**1. Insuring Agreement**

**a.** We will pay medical expenses as described below for **bodily injury** caused by an accident:

**(1)** On premises you own or rent;

. . .

**b.** We will make these payments regardless of fault. These payments will not exceed the applicable Limit of Insurance. We will pay reasonable expenses for:

**(1)** First aid administered at the time of an accident;

**(2)** Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

**(3)** Necessary ambulance, hospital, professional nursing and funeral services.

Ex. A at 27.

49. Coverage C – Medical Payments contains the following pertinent exclusions:

**2. Exclusions**

We will not pay expenses for **bodily injury:**

. . .

**c. Coverage A Exclusions**

Excluded under Coverage **A.**

Ex. A at 27.

50. The Commercial Marine Liability contains the following pertinent definitions under Section V:

**SECTION V – DEFINITIONS**

. . .

**3. Bodily injury** means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

**4. Biological agents** means any:

**a.** Bacteria, mildew, mold or other **fungi**, other microorganisms, mycotoxins, spores or other byproducts of any of the foregoing;

**b.** Viruses or other pathogens (whether or not a microorganism); or

**c.** Colony or group of any of the foregoing.

. . .

**8.** **Defense costs** means reasonable and necessary fees, costs and expenses incurred by us, or incurred by the insured with our prior, written consent (including premiums for any appeal bond, attachment bond, or similar bond, but without any obligation to apply for or furnish any such bond) resulting from the investigation, adjustment, defense and appeal or a claim against any insured. However, **defense costs** do not include salaries of employees or officers.

. . .

**15.** **Fungi** means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi.

. . .

**25.** **Occurrence** means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

Ex. A at 33-37.

51. Other provisions, conditions, or exclusions in the Policy may also limit or preclude National Casualty's obligations under the circumstances presented.

## III. COUNT I – DECLARATORY JUDGMENT BALL UNDERLYING ACTION

52. National Casualty repleads and incorporates by reference Paragraphs 1-51 above.

53. National Casualty has no duty to defend or indemnify Harbor Grille in the Ball Underlying Action, in whole or in part, due to one or all of the following reasons:

a. Endorsement OM-633-TRI (09-20) – Absolute Communicable Disease Exclusion precludes coverage under the Policy for some or all of the allegations of the Ball Underlying Action.

b. Exclusion c. – Biological Agents precludes coverage under the Policy for some or all of the allegations of the Ball Underlying Action.

c. Exclusion d. – Punitive or Exemplary Damages precludes coverage under the Policy for any such claims alleged in the Ball Underlying Action.

## IV. COUNT II – DECLARATORY JUDGMENT JACKSON UNDERLYING ACTION

54. National Casualty repleads and incorporates by reference Paragraphs 1-53 above.

55. National Casualty has no duty to defend or indemnify Harbor Grille in the Jackson Underlying Action, in whole or in part, due to one or all of the following reasons:

a. Endorsement OM-633-TRI (09-20) – Absolute Communicable Disease Exclusion precludes coverage under the Policy for some or all of the allegations of the Jackson Underlying Action.

b. Exclusion c. – Biological Agents precludes coverage under the Policy for some or all of the allegations of the Jackson Underlying Action.

c. Exclusion d. – Punitive or Exemplary Damages precludes coverage under the Policy for any such claims alleged in the Jackson Underlying Action.

## V. COUNT III – DECLARATORY JUDGMENT BOWER UNDERLYING ACTION

56. National Casualty repleads and incorporates by reference Paragraphs 1-55 above.

57. National Casualty has no duty to defend or indemnify Harbor Grille in the Jackson Underlying Action, in whole or in part, due to one or all of the following reasons:

a. Endorsement OM-633-TRI (09-20) – Absolute Communicable Disease Exclusion precludes coverage under the Policy for some or all of the allegations of the Bower Underlying Action.

b. Exclusion c. – Biological Agents precludes coverage under the Policy for some or all of the allegations of the Bower Underlying Action.

c. Exclusion d. – Punitive or Exemplary Damages precludes coverage under the Policy for any such claims alleged in the Bower Underlying Action.

## VI. COUNT IV – DECLARATORY JUDGMENT SINGLE OCCURRENCE (IN THE ALTERNATIVE)

58. In the alternative, National Casualty repleads and incorporates by reference Paragraphs 1-57 above.

59. In the event the Court determines that coverage exists under the Policy, National Casualty seeks a declaration that the Underlying Actions constitute a single "occurrence" under the Policy because they arise out of a single cause.

## VI. PRAYER FOR RELIEF

**WHEREFORE**, National Casualty requests the following relief:

1. For Count I for Declaratory Judgment, a judicial declaration that National Casualty has no duty to defend or indemnify Harbor Grille, in whole or in part, in connection with the Ball Underlying Action.

2. For Count II for Declaratory Judgment, a judicial declaration that National Casualty has no duty to defend or indemnify Harbor Grille, in whole or in part, in connection with the Jackson Underlying Action.

3. For Count III for Declaratory Judgment, a judicial declaration that National Casualty has no duty to defend or indemnify Harbor Grille, in whole or in part, in connection with the Bower Underlying Action.

4. In the alternative, for Count IV for Declaratory Judgment, a judicial declaration that the Underlying Actions constitute a single "occurrence" under the Policy.

5. For such other relief as the Court deems just.

DATED this 16th day of September, 2025.

/s/ Leah T. Handelman
Attorneys for Plaintiff